IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH. CENTRAL DIVISION

| | |
|---|---|
| BOYD R. YOUNG,<br><br>    Plaintiff,<br><br>vs.<br><br>NANCY A. BERRYHILL,<br>Acting Commissioner of Social Security,<br><br>    Defendant. | MEMORANDUM DECISION AND ORDER<br><br>Case No. 2:16-cv-00844-EJF<br><br><br>Magistrate Judge Evelyn J. Furse |

Plaintiff, pursuant to 42 U.S.C. § 405(g), seeks judicial review of the decision of the Acting Commissioner of Social Security (Commissioner) denying his claim for disability insurance benefits (DIB) under Title II of the Social Security Act ("the Act"). Pursuant to 28 U.S.C. §636(c) and Rule 73 of the Federal Rules of Civil Procedure, both parties have consented to the undersigned conducting all proceedings in this case, including entry of final judgment, with appeal to the United States Courts of Appeals for the Tenth Circuit (ECF No. 20). After careful review of the entire record, the parties' briefs, and arguments presented at a telephonic hearing held on September 14, 2017, the undersigned AFFIRMS the Commissioner's final decision.

I.    PROCEDURAL HISTORY

Plaintiff, age 49 as of the administrative law judge's (ALJ's) decision, has a high school education and past skilled work as a roofer (*see* Certified Administrative Transcript (Tr.) 46, 47 215). He alleges disability since June 23, 2012, primarily due to limitations arising from a broken right leg (*see, e.g.*, Tr. 214). The ALJ followed the familiar five-step sequential evaluation process to determine whether Plaintiff was disabled (Tr. 22-35). *See* 20 C.F.R.

**Page 1**

§ 404.1520(a)(4). As relevant here, between steps three and four, the ALJ found that Plaintiff had the residual functional capacity (RFC) to perform a range of "light work as defined in 20 CFR 404.1567(b)," except he could "stand and/walk no more than two hours in an eight-hour workday," "must be permitted to use a crutch on an as-needed basis when walking," and had some additional postural and environmental limitations (Tr. 26-27, Finding 5). After obtaining vocational expert testimony, the ALJ found that this RFC precluded Plaintiff from performing his past work (Tr. 33, Finding 6), but not from performing other "light" occupations totaling 150,000 jobs in the national economy (Tr. 33-34, Findings 7-10). The ALJ found these jobs existed in "significant numbers" in the national economy and that Plaintiff, therefore, was not disabled as defined by the Act (Tr. 34-35, Finding 11). The Appeals Council later denied Plaintiff's request for review (Tr. 1-6), making the ALJ's decision the Commissioner's final decision for purposes of judicial review. *See* 20 C.F.R. §§ 404.981, 422.210(a). This appeal followed.

## II. SUMMARY OF RELEVANT MEDICAL EVIDENCE AND TESTIMONY

On June 23, 2012, Plaintiff broke his right leg (tibia and fibula) in a four-wheeler accident, requiring surgery and a short hospitalization (Tr. 304-34, 350-51, 380-82, 599, 603-05). Care providers noted he was at risk for non-union of his fractures due to cigarette smoking (Tr. 315). He followed up with his surgeon, Gordon Stock, M.D., in July and August 2012, reporting controlled pain on Percocet and exhibiting decreased swelling; he was using crutches, decreasing how many cigarettes he smoked, and using a nicotine patch (Tr. 301-03). Dr. Stock felt he was doing well and should continue to take pain medications, use ice, and elevate his leg (Tr. 301-03). Plaintiff also followed up with primary care physician Bryan Nelson, M.D., in August and September 2012. Dr. Nelson noted that Plaintiff had decreased to smoking one-half

**Page 2**

a package of cigarettes per day, and found he had no edema, sensory loss, or weakness upon examination (Tr. 430-32, *duplicated at* Tr. 541-43).

In September 2012, Plaintiff had reduced his nicotine intake, and his pain was decreasing (Tr. 299). Dr. Stock recommended a bone stimulator because he suspected Plaintiff might be developing non-union of his leg fractures, and he also recommended only toe-touch weight-bearing for balance with the right leg (Tr. 299-300). Around this time, Plaintiff also followed up with Dr. Nelson, who explained how smoking hindered healing and advised him to stop; he also noted that Plaintiff had no sensory loss or weakness (Tr. 424-26, 427-29, *duplicated at* Tr. 535-37, 538-40).

On October 30, 2012, Dr. Stock stated that Plaintiff had slightly decreased pain and significantly decreased swelling; however, Plaintiff continued to smoke three-fourths of a package of cigarettes per day and x-rays continued to show non-union (Tr. 298). Plaintiff also followed up in late 2012 and early 2013 with Dr. Nelson, who once again urged Plaintiff to stop smoking (Tr. 409). He also noted that Plaintiff's gait and balance were intact with no motor weakness (Tr. 406-08, 409-11, 413-15, 416-19, 420-22, *partially duplicated at* Tr. 519-21, 523-25, 526-29, 530-33).

During this same time period, in December 2012, Plaintiff also started seeing orthopedist Jeffrey Jackson, M.D. Dr. Jackson noted that Plaintiff had markedly decreased right-ankle range of motion, but full right-knee range of motion with no instability (Tr. 344-45). He could put a small amount of weight on the right leg with toe-touch weight-bearing, and he continued to smoke three-fourths of a package of cigarettes per day (Tr. 344). Dr. Jackson "impressed upon [Plaintiff] the importance of stopping smoking. Technically, I think the operation went well. I think the likely cause of the nonunion and the postoperative complications is due to the patient

**Page 3**

smoking" (Tr. 346). He recommended that Plaintiff bear weight as tolerated, continue using the bone stimulator, and follow up in a month, at which time he hoped Plaintiff would report he had stopped smoking (Tr. 346, *duplicated at* Tr. 566). At his next visit, Dr. Jackson explained "[u]nfortunately, he has not stopped smoking. I do think this is affecting his ability to heal" (Tr. 343, *duplicated at* Tr. 563).

Plaintiff continued to smoke and have non-union of his fractures (*see* Tr. 341-42, 473-75), and Dr. Jackson ultimately performed another surgery to remove and exchange the hardware in Plaintiff's right leg in late January 2013 (Tr. 791-808; *see also* 377-79 *duplicated at* 476-80, 600-02).

When Plaintiff followed up with Dr. Nelson in February 2013, Plaintiff was very optimistic with significant improvement in his pain and the ability to put more weight (40 pounds) on his leg than he had in the past seven months (Tr. 340, *duplicated at* Tr. 560). He had been more active, up and moving around, and, while he continued to smoke, he was smoking less (about six or seven cigarettes per day) (Tr. 340, *duplicated at* Tr. 560). Dr. Jackson was concerned about possible infection and told Plaintiff to keep taking antibiotics (Tr. 340, *duplicated at* Tr. 560). Unfortunately, Plaintiff was hospitalized later that month due to a reaction to the antibiotics (Tr. 637-660; *see also* Tr. 339, *duplicated at* Tr. 559).

On March 5, 2013, about two and a half months after the revision surgery, Dr. Jackson opined, among other things, that Plaintiff could not lift and was "currently unable to bear weight on Rt. Lower extremity. He uses a wheelchair to get around" (Tr. 392-95). Dr. Jackson later noted improvement in Plaintiff's pain and ability to bear weight (about 20 pounds) (Tr. 557-58). Dr. Nelson similarly noted that Plaintiff was much improved and smoking less, and that he was exercising occasionally (Tr. 400-02, *duplicated at* Tr. 510-12).

**Page 4**

In April 2013, Dr. Jackson noted that Plaintiff was making good progress with physical therapy and that he had improved range of motion, including significant improvement in ankle dorsiflexion (Tr. 555). He had an antalgic gait with one crutch, and was able to put 25 to 50 percent of his weight on his right foot (Tr. 555). Dr. Jackson recommended that Plaintiff continue to advance his weight-bearing; he was still concerned that Plaintiff could have a low-grade infection, and that smoking was inhibiting healing (Tr. 555). Plaintiff said he was going to return to work soon and wanted to hold off on further treatment until he had insurance (Tr. 555-56). Dr. Jackson thought this was "reasonable as long as he continues his therapy and progressing as tolerated" (Tr. 556). The record contained no evidence that Plaintiff sought further treatment for his leg.

In May 2013, state agency physician Susanne Thobe, M.D., reviewed the record evidence—including Dr. Jackson's opinion—and opined that, within 12 months of his alleged onset date, Plaintiff would have some postural and environmental limitations but would be able to lift/carry 20 pounds occasionally and 10 pounds frequently; sit up to six hours in an eight-hour workday; and stand/walk up to six hours in an eight-hour workday (Tr. 71-74).

In July 2013, Plaintiff completed a Medicaid form (*See* Tr. 503-06) stating that he could cook, clean, shop, and pay bills (Tr. 505). He said driving a car was okay but that walking was "hard to do" (Tr. 505).

In August 2013, Plaintiff sought emergency treatment because he felt like he might pass out (Tr. 494-96). He said he had not eaten all day, drank part of a Sprite, drank two beers, then went out to mow the lawn in 100-degree weather (Tr. 494). Care providers diagnosed dehydration and mild alcohol intoxication, and released him in improved condition (Tr. 494-501, 611-29).

**Page 5**

In September 2013, Plaintiff saw Justin Johnsen, M.D., for a consultative evaluation in connection with his disability claim. He reported that he could stand 10 minutes, walk 200 feet, and lift 20 pounds, and he denied any limitations on sitting (Tr. 607). He continued to smoke, but claimed to have quit drinking alcohol three months earlier (Tr. 607). He said he spent his days mostly in bed (Tr. 607). Upon examination, Plaintiff had trouble walking on his heels and had decreased range of motion of his right leg, but was able to squat with only mild difficulty, carry his personal belongings, rise from a sitting position without help, tandem walk, and get up and down from the examination table (Tr. 610). He had near-full (4.7/5) muscle strength bilaterally in leg flexion, leg extension, ankle plantar flexion, and dorsiflexion, with otherwise full (5/5) strength (Tr. 609). Dr. Johnsen opined that Plaintiff's leg impairment "would limit his ability to walk long distances, do[] very strenuous activities, run[], hop[], skip[], or jump[]" (Tr. 610).

In October 2013, state agency physician Dennis Taggart, M.D., reviewed the record evidence—including the opinions of Drs. Jackson, Johnsen, and Thobe—and opined that Plaintiff had not had any 12-month period of disability, and that Plaintiff had some postural and environmental limitations but could lift/carry 20 pounds occasionally and 10 pounds frequently; sit up to six hours in an eight-hour workday; and stand/walk up to two hours in an eight-hour workday (Tr. 83-87).

At the July 2014 administrative hearing, Plaintiff, who was represented by an attorney (*see* Tr. 40), testified regarding his impairments and limitations. Among other things, he testified that doctors told him to exercise more (Tr. 45) and to use his right leg, but he could not deal with the pain (Tr. 50-51). He said he had not seen a doctor for a while because he did not have insurance, but he had not visited any free clinics (Tr. 50, 52). He took only Aleve for pain relief

**Page 6**

(Tr. 57). He could care for his personal needs and sometimes take his mom to the bank or grocery store, but usually he would lay in bed 20 hours per day with his leg elevated (Tr. 51-54). He could sit two hours and stand/walk two hours total in a workday (Tr. 54). He also claimed that, to get around, he drove and usually used two crutches to walk (Tr. 46). After his alleged onset of disability, he worked for a few weeks part-time for his previous employer, sorting screws and putting things away, but was let go because the employer felt he was a risk due to his leg and hand pain (Tr. 47, 54-55). He said he tried driving for that employer but could not continue because he did not have the necessary credentials (e.g., a commercial driver's license (CDL)) (Tr. 56).

A vocational expert testified that a hypothetical person of Plaintiff's age and background, and with his RFC, could not perform his past relevant work but could perform other work in the national economy, including the "light" occupations of electronics worker (61,000 national jobs), circuit board assembler (47,000 national jobs), and electrode cleaner (42,000 national jobs) (Tr. 59-60). The vocational expert clarified that he contemplated the limitation for using a crutch as needed in the ALJ's hypothetical as meaning "getting to the work station and sitting down. Since those jobs are primarily sit-down jobs" (Tr. 62; *see also* Tr. 64 (explaining that the standing/walking limitations and use of a crutch did not result in significant erosion of the number of identified jobs since they were "sit-down" jobs)).

## III. STANDARD OF REVIEW

The Court reviews the Commissioner's decision to determine whether substantial evidence in the record as a whole supports the factual findings and whether the correct legal standards were applied. *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Id.* (internal quotation and citation omitted). Where the evidence as a whole can support either the agency's decision or an award of benefits, the agency's decision must be affirmed. *Ellison v. Sullivan*, 929 F.2d 534, 536 (10th Cir. 1990). The Court "should, indeed must, exercise common sense" and not "insist on technical perfection." *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1166 (10th Cir. 2012).

## III. DISCUSSION

In challenging the ALJ's decision, Plaintiff asserts that the ALJ erred (1) at step five, by (a) not characterizing Plaintiff's RFC as "sedentary" instead of "light" for purposes of applying the Medical-Vocational Guidelines (the Grids) and (b) not finding a borderline age situation; and (2) when assessing Plaintiff's RFC, by not properly weighing Dr. Jackson's medical opinion and his subjective complaints (*see generally* ECF No. 23, Plaintiff's Brief (Pl. Br.)). For the reasons discussed below, the Court finds that the ALJ's decision should nonetheless be AFFIRMED.

### A. Step Five Determination

The Court finds that the primary issue in this case is whether the RFC, as assessed by the ALJ, was properly characterized as "light" as opposed to "sedentary" for purposes of applying the Grids at step five of the sequential evaluation process. Although conceding that the vocational expert identified a "significant number" of "light" jobs someone with his RFC could perform, Plaintiff posits that the ALJ was required to do an *additional* analysis as to whether the RFC limitations significantly eroded the occupational base before determining that the light, rather than sedentary exertional category of the Grid rules applied (Pl. Br. 10-14, ECF No. 23). Plaintiff's argument is premised on Social Security Ruling (SSR) 83-12. *See* 1983 WL 31253.

Having considered SSR 83-12, however, the Court is convinced that the ALJ did not err. SSR 83-12 explains that the ALJ must make a determination about whether a claimant's RFC

falls into one exertional category or another for purposes of applying the Grids. Specifically, it provides that where, as here, an individual's RFC falls between two exertional categories that direct opposite conclusions under the Grids, the ALJ must, before applying them, determine to what extent the additional RFC limitations erode the higher occupational base. *See* 1983 WL 31253. The Ruling goes on to state that, "[w]here the extent of erosion of the occupational base is not clear, the [ALJ] will need to consult a vocational resource." *Id*. Contrary to Plaintiff's argument, so long as the ALJ consults a vocational expert about the number of available jobs in the national economy, the Ruling does not require that an ALJ explicitly state how much erosion has occurred when considering an RFC that falls between two exertional categories set forth in the Grids. The vocational expert in this case identified three "light" occupations, which, as Plaintiff concedes, constitute a significant number of jobs existing in the national economy. Thus, the Court finds that the ALJ followed the law and substantial evidence supports his determination that Plaintiff was not disabled based on his RFC for a range of "light" work. In so finding, the Court does not reach Plaintiff's secondary argument about borderline age (Pl. Br. 14-15, ECF No. 23), which was necessarily premised on the RFC being characterized as "sedentary."

### B. RFC Determination

The Court also concludes that the ALJ's assessment of Plaintiff's RFC was supported by substantial evidence. In particular, the RFC accounted for all of Plaintiff's supported limitations—including the use of a crutch—that met the 12-month duration requirement (*see* 20 C.F.R. § 404.1509), and the vocational expert's testimony was clear that the jobs at issue were performed primarily in a seated position and would account for the delineated limitations (Tr. 60, 62, 64-65). The ALJ's decision reflects that the RFC assessment was based on a number of

factors, including medical evidence showing improvement over time (*see* Tr. 26-33); the medical opinions of Drs. Johnsen (Tr. 607-610), Thobe (Tr. 71-74), and Taggart (Tr. 83-87); Plaintiff's daily activities (*see* Tr. 26; *see also* Tr. 494, 505); Plaintiff's receipt of unemployment benefits during the purported period of disability (Tr. 48-49); and Plaintiff's continued smoking despite repeated medical advice to stop because it was causing the delayed healing of his leg (*see, e.g.*, Tr. 343, 344, 346, 409, 416, 420, 424, 427, 555).

Plaintiff argues that the ALJ should have given greater weight to his treating physician Dr. Jackson's March 2013 opinion, which indicated greater limitations, e.g., the need for a wheelchair (Pl. Br. 16-20, ECF No.23; *see* Tr. 392-95). However, the Court finds that the ALJ provided valid reasons supported by substantial evidence for discounting this opinion. In essence, as the ALJ explained, the medical evidence reflected the more restrictive limitations cited therein that were imposed shortly after a medical procedure and did not last the requisite 12 months because Plaintiff subsequently improved (Tr. 32-33). *See generally* 20 C.F.R. §§ 404.1509 (12-month duration requirement), 404.1527 (factors for evaluating medical opinions, including consistency with other evidence).

Plaintiff also argues that, when evaluating his subjective complaints, the ALJ should not have considered his daily activities and continued smoking against medical advice and should have expressly considered his long work history (Pl. Br. 21-24, ECF No. 23). The Court does not find reversible error. While Plaintiff's activities were not particularly taxing, they were inconsistent with his description of what he could do and consistent with and supportive of the ultimate RFC finding, which, as noted, included a restriction for the use of a crutch to walk. *See* 20 C.F.R. § 404.1529(c)(3)(i) (when weighing a claimant's statements, ALJ may consider daily activities); *Wilson v. Astrue*, 602 F.3d 1136, 1146 (10th Cir. 2010) (ALJ reasonably found a

claimant's description of her daily activities did not indicate the significant limitations she alleged). And while the Court finds the ALJ should not have considered Plaintiff's continued smoking as a factor when evaluating his subjective complaints, this consideration was not reversible error in light of the ALJ's decision as a whole. *See generally Pickup v. Colvin*, No. 606 F. App'x 430, 433-34 (10th Cir. 2015) (unpublished) (affirming the ALJ's decision to discount the claimant's subjective complaints despite finding two of the reasons given by the ALJ were not supported by substantial evidence). The ALJ's findings as to Mr. Young's smoking more appropriately relate to a failure to follow prescribed treatment than a credibility problem. The ALJ should have applied 20 C.F.R. § 404.1530 and Frey v. Bowen, 816 F.2d 508, 517 (10th Cir. 1987) as discussed in Moses v. Barnhart, 321 F. Supp. 2d 1224, 1232 (D. Kan. 2004), in considering the effect of Mr. Young's continued but reduced smoking. Similarly, while the ALJ did not explicitly address Plaintiff's work history, this Court is not aware of any law in this circuit providing this is error, particularly where, as here, the ALJ has provided several legally valid reasons supported by the record for his determination.

Even if the evidence was susceptible to a different interpretation, the ALJ's decision must be upheld where, as here, substantial evidence supports it, and it is legally sound. *Tillery v. Schweiker*, 713 F.2d 601, 603 (10th Cir. 1983) (when the evidence permits varying inferences, the court may not substitute its judgment for that of the ALJ); *Lax*, 489 F.3d at 1084 ("The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence. We may not displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." (citation and quotation omitted)).

## IV. CONCLUSION

Because the ALJ's decision is supported by substantial evidence and is free of harmful legal error, the Court hereby AFFIRMS.

DATED this 28th day of September, 2017.

_____
EVELYN J. FURSE
United States Magistrate Judge